Duncan, J.
delivered the opinion of the court. The question for the consideration of the court is new, although founded upon a statute as old as 1788. It is important, in order to a proper construction of that statute, not only to look to the language employed in 'it, but to see how the law stood prior thereto.
In the statute branching out the General Court into District Courts, passed in 1788, it is provided, that *725 juries de medietate linguae may be directed by the [Bistrict] court. But the manner in which this power was to be executed, was hot indicated by the statute.
By an ordinance of convention passed in 1776, it is provided, that, the common law of England, all statutes made in aid of the common law prior to the 4th year of King James I, and which are of a general na-. ture not local to that kingdom, shall be the rule of ' decision, and shall be in full force, until the same shall be altered by the legislature. The common law of England or the English statutes falling within the purview of this ordinance of convention, furnish the only means of determining the construction to be given to the statute of 1788.
By the common law, the crown might, in the exercise of its prerogative, and occasionally did, exercise the power of giving to aliens a trial by a jury de medietate linguos; but the power was exercised, or withheld, at the discretion of the crown. And so the law remained in England, until the reign of Edward HE, when a policy was adopted, purely local in its object, which became the foundation of the subsequent power and glory of the British empire. In order to attract to England, artisans from the continent, where manufactures were greatly in advance of England, the strongest inducements were held out, and privileges were extended to aliens, which, in the language of an English historian, “ were not permitted by any other government in the world.” In pursuance of this policy, the statute staple was passed in the 27th year of Edward HI, whereby marts for the purpose of exclusive trade were established, where strangers were invited to settle; and to protect them from the prevailing prejudices of the English people against them, special tribunals were created for the adjudication of all causes connected with trade and. commerce; and whenever an alien became a party, a *726 .jury de medietate linguoe was directed for the trial of his. But as the junction of these tribunals was limited to the trial- of civil causes growing out of mercantile or trading transactions, in the following year, the statute 28 Ed. 3, stat. 2, ch. 13¿ was passed, giving, in all cases, whether civil or criminal, when an alien was a party, a jury de medietate linguae, if he required it. This was not a discretionary power vested in the courts, but mandatory at the will of the alien. This mode of trial, then, which by the common law was a mere favour to be extended or withheld by the crown, became the right of the alien, when demanded of, the courts. The statute of 28 Ed. 3, was in force in England, when the ordinance of the Virginia Convention, in 1776, and the subsequent statute of 1788, were passed; and in deciding the question before us, it is necessary to determine whether the statute of the 28 Ed. 3, wTas adopted by the ordinance of convention of 1776: since, if it was, it furnished the rule for the construction of the statute of 1788, declaring that the courts may order juries de medietate linguae; but if the statute 28 Ed. 3, was not adopted by the ordinance of convention, then the common law, and not the statute, furnishes the rule for expounding the Virginia statute.
• A majority of the judges are of opinion, that the statute of the 28 Ed. 3, never was in force in Virginia, either during its colonial dependence, or by force of the ordinance of convention of 1776, and that the Virginia statute of 1788, was only intended to confer upon the judiciary the same discretionary power over the subject which, by the common law, constituted a portion of the royal prerogative. We find, upon an examination of the records of the General Court, from the year 1776, down to 1788, (when the Virginia statute was enacted,) during which time this court had judicial cognizance of the business of the country, a *727 period too when the public- mind was inflamed by the revolutionary struggle, that there was no case in which a jury de medietaie lingua was allowed, nor have we found any memorial of the exercise of the power during the colonial government. And it may be proper to remark, that had it been the intention of the legislature in 1788, to adopt the English statute of 28 Ed. 3, it is not probable, with the statute before it, that it would have used language which, in its ordinary acceptation, implied a discretion, when the statute it was adopting was mandatory: nor is it probable that, in this particular instance, the legislature would have departed from the rule, which we believe was applied to every other English statute incorporated into our Code, of adopting the same language employed in the English statute, only changing or modifying the language to suit the altered condition of the country, because, in adopting an English statute into our Code, it carried with it the construction given to it by the English courts prior to its adoption here. And such, doubtless, would have been the form of the Virginia statute of 1788, had the legislature intended to adopt the English statute of 28 Ed. 3. But if the legislature intended only to adopt the common law discretionary power upon this subject, then the terms employed were consistent with that intention. And as the common law was declared to be in force in Virginia, the only necessity that existed for legislating at all upon the subject, arose from the separation in this country, of the executive and judicial powers of the government : whereas by the common law this discretionary judicial power was vested in the crown, the power, when authorized to be exercised here, was transferred to the courts.
Some of the judges are of opinion, that the principles of the statute of 28 Ed. 3, are unsuited to the nature of our institutions, the character of our people,, *728 and the structure of our judiciary. The English stat-was enacted in aid of a wise policy at the time;: yet it was a local policy, confined to the country in which it originated; and the comity of nations, except in that particular instance, has never gone so far as to-extend to aliens higher judicial privileges than were extended to citizens. In England, the jealousy of the common law denied to aliens the privileges of citizenship. To compensate the alien for the disabilities under which he laboured, a jury to try his causes, composed of equal numbers of aliens and citizens, was allowed to him. And, practically, there was no great inconvenience in doing so, compared with benefit to be-derived from attracting to the country the skill and capital of foreign artisans and merchants, then rendered necessary by the infant state of the trade and manufactures of the country. Besides, the aliens, in that country, spoke a different language, and were collected together at the various marts of trade, and could easily be distinguished from the citizens. It is not so, and never was so, in this country. The moment an alien sets his foot upon our shores, he acquires rights unknown to the laws of England. All aliens may, in a few years, become citizens: they are scattered through the countrv, instead of being confined, as originally they were in England, in certain places; three-fourths of them speak the language of' the country, and are in some degree familiar with its. laws; and from the recent settlement of the country by immigrants from abroad, and the continual influx of foreign immigration, there can exist no such prejudice against them as gave rise to the statute of 28 Ed. 3. And let us see what would be the practical operation of the English statute, if it were in force here. Suppose the statute authorized a trial by a jury de medietate lingace in all eases where an alien is a party, civil as well as criminal, except treason, if the demand *729 exceed twenty dollars, and the alien require it; the court must order, and the sheriff1 must summon, if they can he found in his county, a jury composed, in part, of six aliens; and it will be no excuse, that his county is large, and the aliens dispersed. If six may he found, he must hunt them up; and, in the meantime, the trial must be suspended (as was required in the case under consideration) until they can be got. A large proportion of the aliens in this country (differing, in that respect, from aliens in England) speak the language of the country; and, owing to the facility of acquiring citizenship, it would he difficult to ascertain, whether the foreigner was an alien or a citizen ; yet the sheriff must be presumed to know who are aliens, and who are not, and the courts may, in every case, be called upon to decide whether the juror, who is summoned as an alien, may not he a naturalized citizen. But these are not the only anomalies growing out of such a proceeding: the citizen can only have his cause tried by jurors having a certain property qualification; a qualification supposed to be a test of the fitness of the juror to act in that capacity. But the alien can have his cause tried by a jury, half of whom may he fugitives and vagabonds, the “ scum of the old world cast upon our shores;” for if there-he six aliens in the county, let them be what they may, they must be put upon the jury, if the alien wills it. The aliens, so placed upon the jury, may not understand a word of our language, and yet they are to try a cause, the testimony and the pleadings in which are in a language of which they are ignorant, and must decide upon laws about which they know nothing. hTor are these all the objections that may be urged against that mode of trial. The great end and aim of jury trial, is to insure fairness and impartiality; and every safeguard should be placed around that mode of trial; yet, if in every case where an alien is concerned,. *730 a jury de medietate linguoe is to be allowed, (and it must be demandable of right in every case, or in none,) with what ease, amounting almost to a certainty, mayjustice be defeated? For example, let an alien employed upon our public works (where they are found in numbers) murder, assault, or otherwise maltreat a citizen; if, when put upon his trial for it, he is entitled to six jurors who are aliens, probably his countrymen, peradventure his associates, men like himself, with no interest in the country, indifferent to its laws, and reckless of its peace; would such jurors convict? ¥e are aware that this reasoning may be considered as applying to the impolicy of the law, rather than as proving that the law does not exist. But we are of opinion, that it is a fair argument for the purpose of shewing that the legislature did not intend, whed it enacted the statute of 1788, to incorporate in it the English statute of 28 Ed. 3, open as it would be, in its application to this country, to the objections that have been pointed out, but only intended to confer upon the courts the ancient common law discretionary power over the subject—a sound judicial discretion.
It is to be observed, further, that the legislature in 1792, when engaged in the great work of establishing a code of laws adopted to the altered condition of the country, after having enacted many of the English statutes, very frequently in the identical language of them, re-enacted the statute of 1788, and.then repealed all the English statutes which had been temporarily adopted by the ordinance of convention of .1776. If, therefore, the statute of 28 Ed. 3, was intended to be embraced by the ordinance of convention, it was, as an English statute, repealed by the act of 1792, leaving the Virginia statute of 1788 concerning juries ■de medietate linguoe, without any support from the English statute, and depending alone upon the common law as furnishing the means for expounding it. So *731 ■that, if the statute of 28 Ed. 3, was ever in force in Virginia, it ceased to be in force after the repealing •statute of 1792.
We have felt the force of the argument, that the ■word may, used in the Virginia statute, should be construed imperatively, and be taken as equivalent to ■shall. It is undeniably correct, that when the performance of a public duty is required of the court, the word may is mandatory. Thus the County Courts may lay a levy for certain purposes; this would be construed shall lay a levy, &c., and in criminal cases, where a benefit or privilege is intended to be secured to the prisoner or accused, ordinarily and as a general rule, the term may, if employed, will be construed imperatively. But this rule must always yield to the obvious intention of the legislature. We have endeavored to shew, that the intention of the legislature was only to give to the courts a discretionary power to direct’ juries de medietate linguae; and that, consequently, the word may, as used in this statute, should receive its literal interpretation.
A majority of the court, therefore, are of opinion, that the Circuit Superior Court in the case under consideration, although in the first instance it directed a jury de medietate linguoe, might with propriety, for aught that appears in the record, have refused to do so; and that the same discretionary power that justified the order to summon such a jury in the first instance, authorized the court to refuse it in the last; and nothing appears in the record to shew that the discretion given by the statute has not been properly exercised.